FILED

2003 DEC 31  P 12: 01

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANNA CIMOCHOWSKI | : |
| | : CIVIL ACTION NO. |
| Plaintiff | : 3:00:CV 363 (AHN) |
| vs. | : |
| | : |
| THE HARTFORD PUBLIC | : December 30, 2003 |
| SCHOOLS, ET AL | : |
| | : |
| Defendants | : |

### DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT AMATO'S DEFENSE OF QUALIFIED IMMUNITY

The defendant, Anthony Amato, hereby submits this Supplemental Memorandum In Support Of His Motion for Summary Judgment on grounds of qualified immunity. Although the discovery deadlines in this case have long passed, the defendants voluntarily complied with a request by Attorney Rosenblatt for an additional deposition on the issue of what legal advice was provided to Anthony Amato before he made the decision to terminate the plaintiff's employment. The plaintiff's counsel has now heard from three witnesses testifying under oath that Mr. Amato sought and obtained a legal opinion from an experienced attorney that he had the authority to terminate the plaintiff's employment by paying her the six figure

severance amount contained in her employment contract, a payment that the plaintiff demanded and received several years ago. Nevertheless, the plaintiff continues to maintain that there is a "complete absence of admissible evidence that Amato received and/or relied on legal advice, and the qualified immunity defense fails as a matter of law." (Plaintiff's Supplemental Memorandum at page 3). Simply put, plaintiff inappropriately asks that the court ignore the testimony of these three witnesses because it defeats her recovery in this case against Mr. Amato as an individual defendant. This unrefuted and admissible evidence compels a finding that Mr. Amato's actions are protected by qualified immunity and that he is entitled to summary judgment in his favor on claims against him as an individual defendant.

When asked at his deposition in June 2000 about the decision to terminate Ms. Cimochowski's employment, Mr. Amato made clear that he sought and received legal advice that he could terminate Ms. Cimochowski's employment by paying her the severance amount contained in her employment contract. (Amato deposition at pages 40-48). Robert Stacy, the Human Resources Director for the Hartford Public Schools confirmed in his deposition that he sought legal advice on behalf of the school and conveyed it to Mr. Amato so that the superintendent would understand the school system's rights and responsibilities when making employment decisions regarding the plaintiff. (Stacy deposition at pages 44-53).

On December 5, 2003, Attorney Rosenblatt chose to depose Attorney Ann Bird, Assistant Corporation Counsel for the City of Hartford about this legal opinion that she gave more than four years ago. In this deposition, Ann Bird confirmed that before Ms. Cimochowski was terminated, Attorney Bird was asked to provide an opinion for the superintendent about the school's rights and obligations regarding Ms. Cimochowski's employment. (See Bird deposition attached as Exhibit A at pages 11-41). Attorney Bird recalls researching this issue and reaching the conclusion that the school could terminate Ms. Cimochowski's contract by paying her the severance provided in the written contract. As mentioned above, Mr. Amato recalls receiving the advice and that it came from the school's legal advisors. Attorney Bird recalls giving the advice. Both believe that the advice was conveyed through Robert Stacy in the human resources department. This is confirmed by Robert Stacy's recollection of events as cited above. This consistent testimony from three witnesses under oath plainly establishes that Mr. Amato did not act with reckless disregard for Ms. Cimochowski's employment rights as alleged by the plaintiff, but sought and relied upon a legal opinion from a qualified attorney.

Because this testimony so clearly establishes that Mr. Amato's discretionary decision to terminate Ms. Cimochowski's employment is covered by the doctrine of qualified

immunity, Attorney Rosenblatt simply asks the court to ignore this testimony. In so doing, he makes the absurd claim that Attorney Bird does not have sufficient personal knowledge to testify because, in his opinion, "her recollection of events was completely hazy." (Plaintiff's Supplemental Memorandum at 3). A review of the complete sworn testimony of Attorney Bird, which is attached as an exhibit to this memorandum, makes clear that Attorney Bird is testifying from personal knowledge. Since this is the only basis upon which Attorney Rosenblatt seeks to attack the evidence that Mr. Amato appropriately relied on legal advice when making the termination decision, his claim must fail as a matter of law. The court should grant summary judgment for Mr. Amato on grounds of qualified immunity.

## CONCLUSION

As the deposition testimony of Mr. Amato, Mr. Stacy and Attorney Bird makes clear, Mr. Amato sought and received legal advice from an experienced attorney about Ms. Cimochowski's employment rights before making the decision to terminate her employment by paying her a severance in excess of $100,000 as provided by her written employment contract. Because this conduct is inconsistent with the plaintiff's claim that Mr. Amato acted with reckless disregard for her legal rights, she is claiming that these conversations never occurred. She cannot be permitted to carelessly disregard the sworn testimony of these three

4

**SHIPMAN & GOODWIN** LLP • *COUNSELORS AT LAW*
ONE AMERICAN ROW • HARTFORD, CONNECTICUT 06103-2819 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

witnesses. Mr. Amato is entitled to rely on the defense of qualified immunity and summary judgment should be entered in his favor on the claim against him as an individual defendant.

DEFENDANTS,
THE HARTFORD PUBLIC SCHOOLS,
ET AL

BY _____
Linda L. Yoder
Federal Bar No. ct01599
Lyoder@goodwin.com
Shipman & Goodwin LLP
One American Row
Hartford, CT  06103-2819
(860) 251-5000
Their Attorneys

## CERTIFICATION OF SERVICE

I hereby certify that the foregoing Defendant's Memorandum in Response to Plaintiff's Supplemental Memorandum In Opposition to Defendant Amato's Defense of Qualified Immunity was sent by U.S. Mail, postage prepaid, this 30th day of December, 2003 to:

Attorney Leon M. Rosenblatt
10 North Main Street
West Hartford, CT  06107

                                              _____
                                              Linda L. Yoder

361258 v.01

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   DISTRICT OF CONNECTICUT
 3
 4
                 ------------------------x
 5
     ANNA M. CIMOCHOWSKI,           :
 6
                 Plaintiff,         :
 7
          -versus-                  :  No. 3:00CV 363(AHN)
 8
     THE HARTFORD PUBLIC
 9   SCHOOLS, ET. AL.,              :
10               Defendants.        :
11               ------------------------x
12
13               Deposition of ANN E. BIRD, taken
14   pursuant to Rule 30 of the Federal Rules of Civil
15   Procedure, at the law offices of Shipman & Goodwin,
16   LLP, Hartford, Connecticut, before Jacqueline
17   McCauley, RPR/CSR, a Notary Public in and for the
18   State of Connecticut, on December 5, 2003, at 1:10
19   p.m.
20
21
22
23
24
25
```

Page 2

1  APPEARANCES:
2     For the Plaintiff:
3     LAW OFFICES OF LEON M. ROSENBLATT
      10 North Main Street, Suite 214
4     West Hartford, Connecticut 06107-1988
      By: LEON M. ROSENBLATT, Esq.
5
6     For the Defendants:
7     SHIPMAN & GOODWIN, LLP
      One American Row
8     Hartford, Connecticut 06103
      By: LINDA YODER, Esq.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              STIPULATIONS
2
3         IT IS HEREBY STIPULATED AND
4  AGREED by and between counsel for the
5  respective parties hereto that all
6  technicalities as to proof of the official
7  character before whom the deposition is to
8  be taken are waived.
9
10        IT IS FURTHER STIPULATED AND
11 AGREED by and between counsel for the
12 respective parties hereto that the
13 deposition may be signed before any Notary
14 Public.
15
16        IT IS FURTHER STIPULATED AND
17 AGREED by and between counsel for the
18 respective parties hereto that all
19 objections, except as to form, are reserved
20 to the time of trial.
21
22
23        * * * * * *
24
25

Page 4

1              WITNESS INDEX
2                              PAGE
3  Direct Examination by Mr. Rosenblatt    6
4
5
6
7
8
9              EXHIBIT INDEX
10 PLAINTIFF'S    DESCRIPTION         PAGE
11     1     Notice of Deposition     10
12     2        Affidavit             12
13     3         Memo                 27
14     4         Contract             36
15     5         Letter               42
16     6     Portion of Answer        43
17
18 NOTE: Exhibits retained by counsel.
19
20
21
22
23
24
25

Page 5

1  ANN E. BIRD,
2  512 Kelsey Street, Middletown, Connecticut,
3       called as a witness, having been first duly
4       sworn by Jacqueline M. McCauley, a Notary
5       Public in and for the State of Connecticut,
6       was examined and testified as follows:
7            MR. ROSENBLATT: I didn't know you
8  lived in Middletown.
9       A.  Yeah.
10           MS. YODER: Before we get started
11 the usual stipulations and you're going to want to
12 read and sign?
13      A.  I am going to want to read and sign.
14           MS. YODER: The only thing I always
15 add to the usual stipulations is we are not waiving
16 objections to attorney/client or work product
17 privilege or any privilege objections except to the
18 extent that this is an unusual case. So I should put
19 that on the record that with regard to the issue of
20 the affirmative defense of one defendant, the former
21 superintendent Anthony Amato, we are waiving the
22 attorney/client privilege as it relates to that
23 defense, which is that in making the decision to
24 terminate the employment of Anna Cimochowski as
25 assistant superintendent, he relied on the advice of

Page 6

1  counsel with regard to the school's rights and
2  obligations to her. So advice given to him, legal
3  advice given to him on that issue up to the time that
4  he made the decision, which would be the relevant time
5  period for his defense, the defendant, Hartford Public
6  Schools, is waiving their privilege claim. They are
7  not waiving their privilege claim to anything beyond
8  the scope of that defense.
9           MR. ROSENBLATT: My silence should
10 not reflect either agreement or disagreement.
11          MS. YODER: Well -- and I'm assuming
12 that if we have agreements, we either work them out or
13 we'll go talk to the judge about them. I know that we
14 are beyond the discovery deadline in this case, but
15 when we moved to amend the complaint, we did
16 indicate --
17       A. Answer.
18          MS. YODER: We moved to amend the
19 answer -- thank you for correcting me -- that we did
20 indicate that we would make available discovery on
21 this issue. So we're certainly voluntarily making Ann
22 available today and we'll see where we get and if we
23 run into conflict, then we'll deal with it.
24 DIRECT EXAMINATION
25 BY MR. ROSENBLATT:

Page 7

1       A. Hi.
2       Q. Hi. What do you do for a living?
3       A. I'm an attorney.
4       Q. Where?
5       A. I work for the City of Hartford,
6  Connecticut.
7       Q. In what office?
8       A. The office of the corporation counsel.
9       Q. What is your title?
10      A. Assistant corporation counsel.
11      Q. And to whom do you report?
12      A. The corporation counsel.
13      Q. How long have you been doing that?
14      A. Since 1994, end of July, early August.
15      Q. What did you do before that?
16      A. I was a partner in the Hartford law firm
17 of Pepe & Hazard.
18      Q. And before that?
19      A. I was an associate at Pepe & Hazard.
20      Q. What years were you with Pepe & Hazard?
21      A. '92 -- I'm sorry, '87 through '94.
22      Q. And what did you do before going to work
23 for Pepe & Hazard?
24      A. I was -- immediately before I was
25 unemployed. Before that I was an associate at

Page 8

1  Ebenstein & Ebenstein for about six months.
2       Q. And before that?
3       A. I was an associate at Sidly & Austin in
4  Los Angeles, California.
5       Q. During what period of time?
6       A. 1984 through the middle of 1986 or spring
7  of 1986.
8       Q. And before that?
9       A. I was an associate at a firm called
10 Parkinson, Wolf, Lazar & Leo in Los Angeles,
11 California.
12      Q. What years?
13      A. '82 to '84. Before that I was a student.
14      Q. Where did you go to law school?
15      A. University of California at Davis.
16      Q. When did you graduate?
17      A. 1982.
18      Q. Where did you go to college?
19      A. University of California at Berkeley.
20      Q. And when did you graduate?
21      A. 1979.
22      Q. In your work at the office of Corporation
23 Counsel what kind of work do you do?
24      A. My assignment primarily has been the
25 school department, the school system for the City of

Page 9

1  Hartford and I've been involved in almost all of their
2  legal matters. So that includes litigation, labor and
3  employment matters, administrative matters, counseling
4  and advice, special education, almost everything that
5  they do that involves a legal matter.
6       Q. When you say the school department, what
7  do you mean?
8       A. Hartford Public Schools, the Hartford
9  Board of Education, the school system of the City of
10 Hartford, public schooling system.
11      Q. What did you do at Pepe & Hazard?
12      A. I was -- I started out as an associate
13 doing mostly commercial litigation. I developed an
14 interest in unemployment and labor, started doing
15 employment and labor and municipal work in general.
16      Q. What did you do at Ebenstein & Ebenstein?
17      A. Not much. They were, as you probably
18 recall, a plaintiff's personal injury firm.
19      Q. Right. Were you there when they were
20 imploding?
21      A. No. It was before they imploded although
22 they weren't trying cases at the time. Somebody --
23 there was some -- for some reason that I never fully
24 understand the Court wasn't allowing them to try cases
25 and so it was seeing clients and drafting complaints

Page 10

1  basically was what it was.
2  Q. And Sidly & Austin?
3  A. Commercial litigation and products
4  liabilities, mostly pharmaceutical types of products,
5  defense.
6  Q. And Parkinson & Wolf?
7  A. That was a professional liability defense
8  kind of firm, attorney malpractice, accounting
9  malpractice were the primary kinds of things, security
10 brokers, that kind of thing.
11 Q. Why did you leave Pepe & Hazard?
12 A. I guess I wanted a life-style change
13 primarily.
14 Q. What do you mean?
15 A. I was not a successful rainmaker and I
16 wanted to work less intensely.
17 Q. I want to mark as Exhibit 1 a copy of the
18 Notice of Deposition for today.
19         (Plaintiff's Exhibit 1, marked for
20          identification.)
21 Q. You've seen that I take it?
22 A. Yes.
23 Q. This is a rule 30 Notice of Deposition in
24 which a particular person wasn't noticed, but rather
25 the Hartford Public Schools was noticed and the

Page 11

1  Hartford Public Schools was instructed to appoint an
2  individual or individuals to testify about certain
3  things that are specified in the deposition notice. I
4  take it you are that person?
5  A. Yes.
6  Q. Who appointed you?
7  A. I guess I was appointed by me in
8  collaboration with Attorney Yoder, because I have the
9  role of representing, coordinating with Attorney Yoder
10 on behalf of the school system on behalf of the
11 defendants in this case.
12 Q. Were any officials of the Hartford Public
13 Schools involved in that decision?
14 A. Not that I am aware of.
15 Q. So it was just you and Attorney Yoder?
16 A. Yes.
17 Q. And why did you appoint yourself?
18 A. Well, because I'm the person that or I'm a
19 person who gave legal advice to Mr. Amato upon which
20 he relied in making the decisions that, some of the
21 decisions.
22 Q. Who are other people --
23 A. Who?
24 Q. -- that gave legal advice to Mr. Amato?
25 A. Ann Marie DeGraffenreidt,

Page 12

1  D-E-G-R-A-F-F-E-N-R-E-I-D-T.
2  Q. And where does she work now?
3  A. She happens to work for the Center for
4  Children's Advocacy.
5  Q. She is a former associate of Shipman &
6  Goodwin?
7  A. Yes.
8  Q. You have some documents that you brought
9  in connection with the deposition notice. May I see
10 them?
11 A. Yes. I also brought the deposition notice,
12 but ...
13         (Plaintiff's Exhibit 2, marked for
14          identification.)
15 Q. Exhibit 2 is a copy of your January 15,
16 2003 affidavit, correct?
17 A. Yes.
18 Q. If you turn to the second page and look at
19 paragraph five, it says, "Before making a decision to
20 terminate Anna Cimochowski's employment,
21 Superintendent Anthony Amato requested and obtained a
22 legal opinion that the Teacher Tenure Act, Connecticut
23 General Statute Section 10-151, did not apply to her."
24 How do you know that?
25 A. Because I gave him such a legal opinion.

Page 13

1  Q. To whom?
2  A. To Mr. Amato. I believe it was delivered
3  to him through Mr. Stacey and/or directly to
4  Mr. Amato. It was an oral statement, oral opinion.
5  Q. So it might have been that you gave the
6  opinion to Mr. Stacey and Mr. Stacey gave it to Amato?
7  A. Might have been delivered that way.
8  Q. And are you saying it might have been that
9  you gave it to Amato directly?
10 A. Yes.
11 Q. Do you know which it was?
12 A. I don't have a clear recollection as I'm
13 sitting here today.
14 Q. Do you have any recollection at all, even
15 a fuzzy one?
16 A. I have a recollection of giving the
17 opinion.
18 Q. To someone?
19 A. Yes.
20 Q. But you don't know who?
21 A. I know it was either Mr. Stacey together
22 with Mr. Amato or Mr. Stacey on behalf of Mr. Amato.
23 I know that Mr. Amato asked the question.
24 Q. How do you know that?
25 A. Because he was the one making the

Page 14

1  decision.
2  Q. But how do you know he asked the question?
3  A. Well, I remember that the question was
4  asked that Mr. Amato wanted to know.
5  Q. So Mr. Amato thought about the question of
6  whether or not the Teacher Tenure Act applied to Dr.
7  Cimochowski and asked for some assistance in answering
8  it?
9  A. I don't know what Mr. Amato thought about.
10 I know that Mr. Amato asked the question that
11 encompassed the tenure act question, that a question
12 was asked what are the school system's
13 responsibilities and rights with respect to Dr.
14 Cimochowski's employment situation.
15 Q. How do you know he asked that question?
16 A. It's my recollection.
17 Q. What do you remember about it?
18 A. That the question was asked and then I
19 answered it.
20 Q. But how do you know it was asked by
21 Mr. Amato?
22 A. Well, because that's how I remember it.
23 Q. Well, it might have been asked by
24 Mr. Stacey.
25 A. It might have been asked by Mr. Stacey on

Page 15

1  behalf of Mr. Amato, that's correct.
2  Q. But you don't know one way or the other?
3  A. I don't remember right now one way or the
4  other.
5  Q. Now, Mr. Stacey held what position?
6  A. He was the head of the human resources
7  department of the Hartford Public Schools.
8  Q. Regardless of whether it came directly
9  from Mr. Amato or directly from Mr. Stacey I would
10 like you to state to the best of your ability what the
11 question was that was given to you.
12 A. I don't have a verbatim recollection of
13 what the question was. The substance of the question
14 was what are our responsibilities and our rights with
15 respect to Dr. Cimochowski's employment.
16 Q. When was this issue raised?
17 A. Sometime in the spring of -- sometime in
18 the months before the decision to fire her, the
19 termination letter was issued, which I believe was in
20 May of 1999, but I could have my years wrong. So my
21 best recollection is that this question was asked as
22 to Dr. Cimochowski in March or April, but it might
23 have been early May of 1999. I don't think it was
24 March. I think it must have been April or early May,
25 1999.

Page 16

1  Q. All right. Was there -- is there anything
2  in writing that reflects that this question was asked?
3  A. No.
4  Q. Is there anything in writing that reflects
5  when it was asked?
6  A. No, not that I am aware of.
7  Q. Why did he want to know that assuming --
8  scratch that. What is your understanding about why he
9  wanted to know that?
10 A. My understanding of why Mr. Amato wanted
11 to know that was that he wasn't happy with her role as
12 an assistant superintendent and he wanted to terminate
13 that relationship.
14 Q. Well, he had already replaced her. He had
15 already brought in two people or told two people to
16 come and plans had already been made to come to
17 replace her. So it wasn't a question of whether he
18 was going to keep her as assistant superintendent,
19 right?
20 A. I'm not sure what your question is,
21 Mr. Rosenblatt.
22 Q. If the question came to you in April or
23 May, it came to you after the decision had already
24 been made by Mr. Amato to replace her as assistant
25 superintendent with one or two other people, correct?

Page 17

1  A. I can't say that's the case. I don't
2  believe that's the case.
3  Q. All right. At any rate the question that
4  was presented, as you recall it, is what do we have to
5  do with regard to her position as assistant
6  superintendent, am I correct?
7  A. What are our rights and obligations.
8  Q. With regard to her position as assistant
9  superintendent?
10 A. Her employment with the Hartford Public
11 Schools.
12 Q. Okay. And once this question came to your
13 attention what did you do about it?
14 A. I conducted some legal analysis. I did
15 some research. I had addressed the question before and
16 I gave it some more thought and effort. I searched. I
17 reread the statute, --
18 Q. When you say --
19 A. -- did other analysis.
20 Q. When you said you had addressed it before,
21 what are you referring to?
22 A. Well, I don't know if I addressed maybe is
23 the wrong word. I had considered the question before,
24 considered, addressed, you know. In general, I had
25 studied the question before of the question of tenure

Page 18

1  status of assistant superintendents.
2  Q. When did you do that?
3  A. Some years before. I can't give you a
4  date.
5  Q. What were the circumstances?
6  A. The question was asked by my client about
7  the rights and responsibilities of he as an employer
8  vis-a-vis assistant superintendents.
9  Q. Who asked you?
10  A. I'm not sure -- to me that would involve a
11  privilege that we haven't waived.
12  Q. Well, that's when you initially studied
13  the question, right?
14  A. Yeah.
15  MS. YODER: I would claim it to the
16  extent that you're asking about her knowledge of this
17  area, how much time she spent looking at it, I don't
18  think that's a problem. But whether other individuals
19  had employment considerations, whether employment was
20  going to be terminated or not and discussions about
21  the legal effect of that I think is beyond the scope
22  of, well beyond the scope of this defense by this
23  superintendent who wasn't even there at the time.
24  A. And it wasn't Mr. Amato or anybody in his
25  administration. This was years before he ...

Page 19

1  Q. How many years?
2  A. It was before 1997.
3  Q. And what was your conclusion?
4  A. My conclusion at that time was that
5  assistant superintendents were excluded from the
6  benefits or obligations of 10-151.
7  Q. So what happened to the assistant
8  superintendent who was the subject of the inquiry?
9  MS. YODER: I would object to that
10  again.
11  MR. ROSENBLATT: With all due
12  respect that's absurd, because we all know that Anna
13  Cimochowski is the first assistant superintendent in
14  Hartford and probably the first and only assistant
15  superintendent in the entire State of Connecticut who
16  has ever been terminated without tenure rights and if
17  Attorney Bird considered the precise question some
18  years earlier and the assistant superintendent then
19  was not terminated, then that goes to the question of
20  what her conclusion actually was.
21  MS. YODER: Well, I --
22  MR. ROSENBLATT: I think I have to
23  know the circumstances so that I can fairly judge
24  whether or not she is being fully forthcoming
25  presently and whether or not she came up, actually

Page 20

1  came up with a different opinion the first time it
2  came up or whether someone overruled it or someone
3  thought it wasn't reliable. I need to know all that
4  stuff. It's absolutely relevant. You raised the
5  defense. I get to ask this question.
6  MS. YODER: And I'm saying that in
7  terms of asking her what knowledge she had on the
8  subject that led to her opinion I think you can ask
9  that. You and I both know that there's many reasons
10  why someone may make inquiries, do I grant them
11  tenure, does this count toward their tenure, if they
12  switch in this position out of this position, are they
13  tenured. That has nothing to do with termination or
14  someone may change their mind. So this assumption
15  that you're making I think is a false one, but I don't
16  think we've waived the privilege with regard to legal
17  advice given about other individuals. We've waived it
18  about what advice she gave on this occasion and what
19  research she did to get to that advice.
20  MR. ROSENBLATT: You are instructing
21  her not to answer?
22  MS. YODER: Based on a claim of
23  attorney/client privilege, yes.
24  MR. ROSENBLATT: All right. We'll
25  have to take that to the judge.

Page 21

1  MS. YODER: That's fine. I would
2  just say I don't know how often this is going to come
3  up, but if it does, I mean, you and I, we can talk.
4  If we can work it out, great. If not, I would prefer
5  or hope -- it's your deposition. However you want
6  that you can ask all the questions you can and we can
7  go with the judge with all of them at once.
8  Q. That's what I was plan on doing. You said
9  this was before 1997. How many years before 1997?
10  A. Well, I had the job from 1994 so it was
11  sometime, I believe to the best of my, you know,
12  recollection, '95 or '96.
13  Q. You would agree with me, wouldn't you,
14  that Anna Cimochowski was the first assistant
15  superintendent, at least during your tenure in the
16  City of Hartford, who was treated as if she did not
17  have rights under the Teacher Tenure Act?
18  MS. YODER: Object to the form of
19  the question.
20  A. I wouldn't agree. I mean, treated by who?
21  Not by me.
22  Q. Well, by the superintendent.
23  A. I don't know. You know, I don't know how
24  it would come up.
25  Q. Well, there has never been, to your

**Page 22**

1  knowledge, an assistant superintendent who was
2  terminated without being afforded his or her teacher
3  tenure right, correct, other than Dr. Cimochowski?
4      MS. YODER: Object to the form of
5  the question.
6      A. During the time I've been involved as
7  assistant corporation counsel with the Hartford Public
8  Schools to my knowledge there hasn't been an assistant
9  superintendent terminated with or without a hearing or
10 notice of the reasons or any of the rest of it. It
11 hasn't come up.
12     Q. Why did it come up between 1994 and 1997?
13     MS. YODER: I'll object on the same
14 grounds as previously. I think that is the same
15 privilege question.
16     MR. ROSENBLATT: I claim it. I'm
17 not asking for any communications. I'm just asking
18 why it came up. I'm not asking for her research. I'm
19 not asking for anything, just why it came up.
20     MS. YODER: Well, I guess I would
21 say that was asked and answered. I think she did ask
22 and answer that question of how she came to look at it
23 already.
24     MR. ROSENBLATT: Would you answer
25 that?

**Page 23**

1      MS. YODER: I mean, if you can
2  answer that limited question, I think you can.
3      A. Yeah. I was asked by the client what are
4  our rights and obligations in substance vis-a-vis
5  assistant superintendent.
6      Q. When you say client, who do you mean?
7      A. I mean an official of the Hartford Board
8  of Education. I feel as though saying who would
9  infringe on the privilege.
10     Q. Is there anything in writing that reflects
11 that this early question was posed?
12     A. Not to my knowledge.
13     Q. What did you do after you got the
14 question?
15     A. Did some research.
16     Q. What research did you do?
17     A. I don't have a present recollection. I
18 think though it would be fair to say I read the
19 statute, looked for any case law in point.
20     Q. What did you find?
21     A. I found the statute 10-151 and I found no
22 case law in point that really was directly on point.
23     Q. What did you tell your client?
24     A. I had the same opinion at that time that I
25 did with Mr. Amato.

**Page 24**

1      Q. And would it be fair to say that your
2  opinion was that an assistant superintendent is not
3  below the rank of a superintendent?
4      A. My opinion is that an assistant
5  superintendent is within the rank of superintendent as
6  those words are used on section 10-151.
7      Q. And not below the rank of a
8  superintendent?
9      A. My opinion is that it's within the rank.
10     Q. Well, was it your opinion that an
11 assistant superintendent is below the rank of
12 superintendent?
13     MS. YODER: Object to the form of
14 the question.
15     A. Your phraseology is not meaningful to me.
16 The best answer I can give you is as I've said to you
17 before. My opinion is that obviously now the Supreme
18 Court has spoken so it's -- my opinion is different
19 now, but at the time my opinion was that assistant
20 superintendent is within the rank of superintendent as
21 that phrase is used in the statute and therefore does
22 not fall within -- the 10-151 doesn't apply to an
23 assistant superintendent and furthermore, you know, in
24 the case of Dr. Cimochowski, my opinion also focused
25 on the contract, employment contract, but the tenure

**Page 25**

1  issue ...
2      Q. So with regard to that issue that came up
3  between 1994 and '97, is there anything in writing
4  that reflects your research?
5      A. Not that I have other than the statute.
6  You know, I mean, that's a written document.
7      Q. Is there anything in writing that reflects
8  your conclusion?
9      A. No.
10     Q. To whom did you convey your conclusion?
11     MS. YODER: I'll object on the same
12 grounds as attorney/client privilege as before.
13     Q. Is there anything in writing that reflects
14 the substance of your conclusion?
15     A. Well, I mean, there's the briefs I've
16 written on the issue.
17     Q. I'm talking about back then between '94
18 and '97. In other words, did you write a letter to
19 anybody giving your conclusion?
20     A. No, I didn't.
21     Q. Did you keep any notes at all?
22     A. No.
23     Q. Do you remember who you gave your
24 conclusion to?
25     A. Yes.

Page 26

1  Q. Do you remember who asked you the
2  question?
3  A. Uh-huh, yes.
4  Q. Did anyone else work with you on that, on
5  answering that question?
6  A. No.
7  Q. All right. When you were asked in May or
8  April or May of 1999 -- wait. Would it be fair to say
9  that you were asked the same question in April or May
10 of 1999 as you have been asked previously?
11 A. It was generally the same question
12 although it was a different context. The first time I
13 was asked the question it was more hypothetical. When
14 the question was asked about Dr. Cimochowski, it was
15 about Dr. Cimochowski and it was, as I understood, it
16 in light of a firm conclusion that Mr. Amato had made
17 that he was looking to make a change.
18 Q. Did anyone work with you on answering the
19 question in April or May of 1999?
20 A. No.
21 Q. What about Ann Marie?
22 A. No; did not.
23 Q. What part did she play in answering the
24 question?
25 A. In answering the question? She played no

Page 27

1  part in my answering the question. I know that she
2  wrote the letter or the memo because I've seen the
3  memo, but she played no role in the work that I did.
4  Q. By memo you are talking about --
5  A. It's there. Keep looking.
6  Q. Off the record one second.
7     (Whereupon, there was a discussion
8      off the record.)
9     (Plaintiff's Exhibit 3, marked for
10     identification.)
11 Q. We went off the record and marked a memo
12 dated March 15, 1999 to Robert Stacey and it's been
13 marked as Exhibit 3. It's authored by Ann Marie
14 DeGraffenreidt. So Exhibit 3 is the memo that Ann
15 Marie wrote?
16 A. That I was referring to.
17 Q. It was written to Mr. Stacey with a copy
18 to Alan Godlewitz. Who is that?
19 A. I believe that Alan Godlewitz was an
20 individual that was working with Mr. Amato who might
21 have been -- he was not an employee of the Hartford
22 Public Schools that I know about. He was introduced
23 as somebody who Mr. Amato intended to bring in as sort
24 of a chief of staff type of role in the school system,
25 but he never did come in. I mean, he was there in

Page 28

1  March helping Mr. Amato investigate the Hartford
2  Public Schools, I guess, but he never joined the
3  system as a full-time employee, to my knowledge.
4  Q. All right. As I read Exhibit 3, I can't
5  see anything in there that pertains to the issue of
6  whether or not an assistant superintendent has rights
7  under the Teacher Tenure Act. Would you take a look
8  at it and tell me whether you agree and if you don't,
9  point out for me what portions of this memo do pertain
10 to the Teacher Tenure Act?
11     MS. YODER: I am just going to
12 object to the form of the question.
13 A. I mean, let me just say that the memo that
14 Ann Marie wrote, Exhibit 3, had nothing to do with the
15 advice I gave. I don't believe I had seen it. I
16 don't believe I was aware of it. I did not
17 participate in the memo that she wrote, Exhibit 3, and
18 you can interpret it as well as I can.
19 Q. Well, I'm asking if you claim that this
20 document has anything to do with the Teacher Tenure
21 Act and Dr. Cimochowski.
22 A. If I claimed or didn't claim that, I think
23 that would be my work product or my impressions,
24 mental impressions, and as an attorney for the
25 Hartford Public Schools, I certainly couldn't separate

Page 29

1  out my analysis of this as a defense lawyer in this
2  case from anything else.
3  Q. Well, you said earlier that Ann Marie
4  DeGraffenreidt played a role.
5  A. No. I said she didn't.
6     MS. YODER: I'll object to the form
7  of the question. I think -- he didn't finish his
8  question.
9  A. All right.
10    MS. YODER: There was an earlier
11 question and I don't recall what it was, but there was
12 an earlier question where Ann's name came up.
13 A. Oh. I said that --
14    MS. YODER: I don't think there's a
15 question pending at the moment.
16 A. Thank you.
17 Q. All right. Let me ask a fresh --
18 A. Okay.
19 Q. With regard to the question that was put
20 to you concerning Dr. Cimochowski, did anyone other
21 than you have anything to do with coming up with a
22 legal opinion that the Teacher Tenure Act did not
23 govern the situation?
24 A. Can I have the first half of that question
25 read back.

Page 30

1  (Whereupon, the question was
2  read back.)
3  A. No.
4  Q. You and you alone?
5  A. With regard to the question put to me and
6  the answer I gave.
7  Q. Well, are you aware of anyone else who
8  rendered a legal opinion on this?
9  MS. YODER: Object to the form of
10 the question.
11 A. My only qualification in response to your
12 question is that it appears to me that Anna, Ann Marie
13 DeGraffenreidt gave some advice, legal advice in the
14 memo which is Exhibit 3.
15 Q. Okay. Does it appear to you that Exhibit
16 3 includes advice having to do with the Teacher Tenure
17 Act?
18 A. Well, Attorney Rosenblatt, let me say
19 this --
20 Q. Just answer the question. It's a simple
21 question.
22 MS. YODER: I object.
23 MR. ROSENBLATT: You're a witness.
24 You are not a lawyer right now. Just answer the
25 question.

Page 31

1  MS. YODER: Objection.
2  A. Well, if I am not a lawyer right now, then
3  I can't answer the question, because my -- what
4  appears to me about Attorney DeGraffenreidt's memo is
5  as a lawyer and that's what I was trying to say to you
6  before. It had nothing to do with my advice, the
7  answer I gave to the question that Mr. Amato put to
8  me, okay?
9  Q. You're going around in circles. I asked
10 you whether anyone else other than yourself gave a
11 legal opinion having to do with the Teacher Tenure Act
12 and you referred to Exhibit 3. So I want to know are
13 you claiming that Exhibit 3 has to do with the Teacher
14 Tenure Act or not?
15 MS. YODER: I'm going to object to
16 the form of the question, because I do think -- well,
17 I'll object to the form of the question. You can tell
18 me if you want to know why.
19 MR. ROSENBLATT: No.
20 MS. YODER: I don't want to have a
21 speaking objection here.
22 Q. I want an answer.
23 A. It appears to me that Ann Marie
24 DeGraffenreidt gave such an opinion. It appears to me
25 that Exhibit 3 does have something to do with the

Page 32

1  Teacher Tenure Act. Now, my view of that is as a
2  lawyer and, you know, it is my work product that says
3  why that is, but I'll share it with you. Because she
4  seems to be saying in sum and substance if you pay
5  Anna Cimochowski X number of dollars, you can separate
6  her from employment with the Hartford Public Schools.
7  She does not mention providing a hearing or other
8  process under section 10-151. She does not say and by
9  the way you must provide process under 10-151 and I
10 infer from that that you do not have to provide
11 process under 10-151 to Dr. Cimochowski.
12 Q. Okay. Now, you have no knowledge about
13 whether or not this memorandum was shared with
14 Mr. Amato, do you?
15 A. I do not know that one way or other.
16 Q. Okay. So in answering the question in
17 April or May of 1999 you read the statute and what
18 else did you do?
19 A. I searched for relevant judicial
20 authority. I believe I read every case I could find
21 under section 10-151 or at least perused it. I am not
22 going to say -- you know, there are many cases I am
23 very familiar with and others that I am less familiar
24 with, but I reviewed all of the cases I could find
25 under 10-151. I consulted other statutory schemes

Page 33

1  that I thought were relevant or would shed light on
2  the issues. I consulted the statutes of some other
3  states regarding tenure and there may have been other
4  things that I did that I don't have a clear
5  recollection of now.
6  Q. Do you keep time records?
7  A. No, with the exception that at the end of
8  the fiscal year we are asked, people in my office are
9  asked to estimate how many hours we have devoted to
10 the school system work in a gross way, gross I mean a
11 thousand hours last year or 200 hours or five hours.
12 We don't keep contemporaneous time records.
13 Q. Did you -- is there a record anywhere of
14 the time you spent researching this teacher tenure
15 question?
16 A. No, not that I am aware of.
17 Q. When you read the statute, searched for
18 judicial authority, read however many cases under
19 10-151, consulted other statutory schemes, consulted
20 other statutes in other states, did you make any
21 notes?
22 A. I'm sure that I did, but I don't have them
23 now.
24 Q. Where are they?
25 A. I'm sure that I destroyed them. I don't

Page 34

1  keep my notes of legal research as a general rule.
2      Q. So you destroyed your notes and you never
3  put your opinion in writing; is that correct?
4      A. Well, yeah, except that I sort of put my
5  opinion in writing in the letter I wrote to you, but
6  with the exception of that.
7      Q. That letter you wrote to me was after Dr.
8  Cimochowski was fired.
9      A. That's right.
10     Q. How many hours do you think you spent
11 researching the question?
12     A. I think that -- you know, it's an
13 estimate. I think I spent somewhere between 10 and 15
14 or 20 hours.
15     Q. Where did you do this?
16     A. I don't have a clear recollection, but I
17 would say in my office. I think that I went to the
18 state law library.
19     Q. Do you know?
20     A. I don't have a clear recollection. I do
21 have a recollection of consulting statutes of other
22 states and I have sort of a visual recollection of
23 looking at statute books, as strange as that seems.
24     Q. Well, you probably do that with some
25 frequency, don't you?

Page 35

1      A. I don't do research of statutes of other
2  states with frequency, no. So I don't go to the state
3  law library that often.
4      Q. So just to be sure -- backup. Is there
5  any claim that Mr. Borelli is protected by qualified
6  privilege because of legal advice that was given?
7          MS. YODER: If I understand your
8  question, the answer is no. The claim is that
9  Mr. Borelli did not make the decision to terminate nor
10 did he make the decision with regard to the hearing.
11 He wasn't the superintendent at the time. He wasn't
12 the decision maker so certainly since he wasn't
13 involved there is no claim.
14     A. Mr. Rosenblatt, I just remembered
15 something else I did, which was to look at Dr.
16 Cimochowski's employment contract.
17     Q. Well, did that have an effect on your
18 decision?
19     A. Yes.
20     Q. What?
21     A. Because in my opinion, number one, Dr.
22 Cimochowski didn't believe that she was under the
23 guise of 10-151 and, number two, if she had been, she
24 waived such a claim. So it shed light on my opinion
25 as to the tenure issue, but it also sort of was a

Page 36

1  separate opinion -- even if 10-151 applied, it was
2  waived.
3          (Plaintiff's Exhibit 4, marked for
4          identification.)
5      Q. Exhibit 4 is Dr. Cimochowski's contract.
6  Would you point out what portions of that gave you to
7  believe that she did not believe she had 10-151
8  rights?
9      A. The contract, in my opinion, is
10 inconsistent with 10-151. She --
11     Q. I'm asking --
12     A. Let me finish my answer.
13         MS. YODER: Objection. I think she
14 should be allowed to finish her answer.
15     Q. She is supposed to answer the question I
16 asked and the question was, and it's only because this
17 is what you testified, you said that there's language
18 in there that led you to believe that Dr. Cimochowski
19 herself didn't believe she had teacher tenure rights.
20     A. Yes, and my answer is going to have a
21 couple sentences to it so let me finish them. Dr.
22 Cimochowski signed the contract. I know her to be an
23 intelligent, literate woman. The contract in its
24 plain terms says things and I'll tell you what those
25 things are, but they are inconsistent with 10-151.

Page 37

1  Those things are that she could be terminated from her
2  employment with the Hartford Public Schools for good
3  and just cause or for no cause at all. I mean, I
4  guess that's not the words, but the contract allows
5  for her to be fired without cause, terminated without
6  cause or to be transferred to another position in the
7  Hartford Public Schools and different consequences
8  flow from different things, different things that
9  would happen in that regard. If she is to be
10 terminated for reasons other than cause, death or
11 retirement, resignation, etc, she would receive a
12 severance payment. If she were to be transferred then
13 to another position in the Hartford Public Schools,
14 she would receive a salary continuation for the
15 remainder of that fiscal year. To me a person who
16 accepts those terms is acting as though they don't
17 have tenure rights, if you want to put it that way,
18 and/or as though they are waiving them, because those
19 are inconsistent with the idea of tenure.
20     Q. Show me what words you're referring --
21 backup. Do you claim that that contract says that her
22 employment can be terminated or she can be fired
23 without cause? Is that your contention?
24     A. That's how I read it, yes.
25     Q. What words are you looking at? I would

10 (Pages 34 to 37)

SANDERS, GALE & RUSSELL                (203)624-4157

**Page 38**

1  like you to show me.
2     A. In the event of a termination for reasons
3  other than those stated above employee shall receive a
4  severance pay, a lump sum equal to the aggregate
5  salary and accrued vacation and sick days she would
6  have earned under the contract from the actual date of
7  termination to the end of the term of the contract not
8  to exceed one-year's salary.
9     Q. That's a termination of the contract not
10 of her employment, isn't it?
11    A. No. It's of her employment.
12    Q. Show me where it says that.
13    A. I read you the language, Attorney
14 Rosenblatt. I told you what my understanding of it
15 is.
16    Q. May I see it? Are you referring to where
17 it says number six, termination of contract and then
18 it says this employment contract will terminate and
19 the parties will have no further obligations under it
20 and then it has subsections A through F?
21    A. I'm referring to the clause that I read.
22 It says in the event of termination for reasons other
23 than those stated above employee shall receive a
24 severance pay, a lump --
25    Q. Okay. That's under number six,

**Page 39**

1  termination of contract, right? That's what it says,
2  doesn't it?
3     A. Do you want to know --
4     Q. Doesn't it say that?
5     A. I just read it to you.
6     Q. It's in section six under termination of
7  contract, yes or no? What's the answer? Time is
8  passing. You're not answering. Answer the question.
9     A. It's in section six. It's literally under
10 section six, termination of the contract.
11    Q. Thank you. Did you talk to Dr.
12 Cimochowski about her understanding before issuing
13 your opinion?
14    A. No.
15    Q. Did you talk with anyone else?
16    A. About Dr. Cimochowski's opinion or
17 understanding?
18    Q. No, about the question, the whole
19 question. Somebody asked you a question, either
20 Mr. Amato or Mr. Stacey. You went and you did
21 whatever research you recall. Did you talk with
22 anyone else before rendering your opinion about that
23 matter?
24    A. I don't know. I don't remember. I may
25 have. I may not have. I may have talked to

**Page 40**

1  Mr. Stacey. At some point I made a telephone call to
2  Cabe. I don't remember when that was.
3     Q. When you were doing your research, did you
4  make copies of any of the cases or statutes you were
5  looking at?
6     A. I may have.
7     Q. Where are those copies?
8     A. They would be in the file that Attorney
9  Yoder has. I couldn't tell you though that I copied
10 the case then as opposed to later when I wrote the
11 briefs, you know. I couldn't say I copied this case
12 then.
13    Q. So the answer is you don't know where they
14 are; isn't that right?
15    A. I guess the answer is I don't know if I
16 made any copies or kept any copies. That's a good --
17 that's a better answer.
18    Q. When you reached the conclusion that Dr.
19 Cimochowski, as an assistant superintendent, is
20 within, was within the rank of superintendent, what
21 facts did you rely on?
22    A. That her title and role was assistant
23 superintendent of schools. That's the only pertinent
24 fact I can think of.
25    Q. You mean just because her position was

**Page 41**

1  called assistant superintendent and because the word
2  superintendent was part of her position that she was
3  in the rank of superintendent?
4     MS. YODER: Object to the form of
5  the question.
6     A. No, I don't mean just that. That her
7  title and her role was of assistant superintendent of
8  schools.
9     Q. All right. What about her role? I want
10 to know what facts concerning her role did you
11 consider that made you think she was within the rank
12 of superintendent.
13    A. Well, I guess that she was, that she was
14 fulfilling the role, as I understood it, of what an
15 assistant superintendent does and I guess that would
16 be to be a close assistant to the superintendent, to
17 be a person in communication, easy communications with
18 allied views and policies of the superintendent. We
19 didn't -- and to be somebody leading other members of
20 the superintendent's administration, to be a member of
21 the superintendent's cabinet, to be a person helping
22 the superintendent develop things and do things that
23 superintendents do.
24    Q. Is that it?
25    A. I think so.

| | | | | |
|---|---|---|---|---|
| oken 24:18<br>ring 8:6 15:17<br>acey 13:3,6,6,21,22<br>4:24,25 15:5,9<br>17:12,17 39:20 40:1<br>27:24<br>ed 5:10 9:12,14<br>1:18 5:5 15:10<br>15 34:18 35:2<br>38:3,23<br>ent 13:4 42:11<br>1 33:3,20 34:22<br>8:1<br>12:23 17:17<br>19,21 24:21 25:5<br>17 33:17 34:23<br>es 3 3:2,20 34:21<br>40:4<br>ry 32:25 33:19<br>LATED 3:8,10<br>ions 5:11,15<br>4:23<br>5:2<br>13<br>:25 18:12<br>:8 20:8<br>IBED 45:8<br>ose ns 38:20<br>bsta e 15:13 23:4<br>25: 32:4<br>ul 10:15<br>2:3<br>2:4 38:4<br>intendent 5:21,25<br>21 16:12,18,25<br>6,9 18:23 19:8,13<br>15 18 21:15,22<br>1,9 23:5 24:23,5<br>5,8,11,12,20,20<br>23 28:6 35:1<br>19,20,23 41:1,2,3<br>7,12,15,16,18,22<br>3,7,7<br>intendents 18:1,8<br>41:23<br>intendent's 41:20<br>1<br>sed 36:15<br>me 24:17<br>6:20 18:10 33:22<br>5 35:4<br>20:12<br>5:4 45:8<br>8:25 9:9,10<br>27:24 28:3<br>0<br>1's 14:12<br>T<br>3:1,1<br>ke 10:21 11:4 20:25 | 28:7<br>taken 1:13 3:8<br>talk 6:13 21:3 39:11,15<br>39:21<br>talked 39:25<br>talking 25:17 27:4<br>teacher 12:22 14:6<br>21:17 22:2 28:7,10<br>28:20 29:22 30:16<br>31:11,13 32:1 33:14<br>36:19 43:18,20,21,21<br>technicalities 3:6<br>telephone 40:1<br>tell 23:23 28:8 31:17<br>36:24 40:9<br>tenure 12:22 14:6,11<br>17:25 19:16 20:11,11<br>21:15,17 22:3 24:25<br>28:7,10,20 29:22<br>30:16 31:11,14 32:1<br>33:3,14 35:25 36:19<br>37:17,19 43:21<br>tenured 20:13<br>term 38:7 42:8<br>terminate 5:24 12:20<br>16:12 35:9 38:18<br>terminated 18:20<br>19:16,19 22:2,9 37:1<br>37:5,10,22<br>termination 15:19<br>20:13 38:2,7,9,17,22<br>39:1,6,10<br>terms 20:7 36:24 37:16<br>testified 5:6 36:17<br>testify 11:2<br>thank 6:19 29:16 39:11<br>thing 5:14 10:10<br>things 10:9 11:3 33:4<br>36:24,25 37:1,8,8<br>41:22,22 42:2<br>think 15:23,24 18:18<br>18:21 19:22 20:8,15<br>20:16 22:14,21 23:2<br>23:18 28:22 29:7,14<br>31:16 34:10,12,13,17<br>36:13 40:24 41:11,25<br>thought 14:5,9 17:16<br>20:3 33:1<br>thousand 33:11<br>three 43:16<br>time 3:20 6:3,4 8:5<br>9:22 18:17,23 19:4<br>20:1 22:6 23:24<br>24:19 26:12 33:6,12<br>33:14 35:11 39:7<br>title 7:9 40:22 41:7<br>today 6:22 10:18 13:13<br>told 16:15 38:14<br>transferred 37:6,12<br>treated 21:16,20<br>trial 3:20<br>try 9:24<br>trying 9:22 31:5<br>turn 12:18<br>two 16:15,15,25 35:23<br>type 27:24 | types 10:4<br><br>**U**<br>U 3:1<br>Uh-huh 26:3 43:11<br>undersigned 45:9<br>understand 9:24 35:7<br>understanding 16:8,10<br>38:14 39:12,17<br>understood 26:15<br>41:14<br>unemployed 7:25<br>unemployment 9:14<br>UNITED 1:1<br>University 8:15,19<br>unusual 5:18<br>usual 5:11,15<br><br>**V**<br>vacation 38:5<br>valid 43:20<br>verbatim 15:12<br>versus 1:7<br>view 32:1<br>views 41:18<br>visual 34:22<br>vis-a-vis 18:8 23:4<br>voluntarily 6:21<br><br>**W**<br>wait 26:8<br>waived 3:8 18:11 20:16<br>20:17 35:24 36:2<br>waiving 5:15,21 6:6,7<br>37:18<br>want 5:11,13 10:17<br>16:7 21:5 31:12,18<br>31:20,22 37:17 39:3<br>41:9<br>wanted 10:12,16 14:4<br>16:9,10,12<br>wasn't 9:24 10:24<br>16:11,17 18:23,24<br>20:3 35:11,11,12<br>way 13:7 15:2,3 32:9<br>32:15 33:10 37:17<br>went 27:11 34:17 39:20<br>weren't 9:22<br>West 2:4<br>we'll 6:13,22,23 20:24<br>we're 6:21<br>we've 20:16,17<br>witness 4:1 5:3 30:23<br>Wolf 8:10 10:6<br>woman 36:23<br>word 17:23 41:1<br>words 24:6 25:18 37:4<br>37:20,25<br>work 5:16 6:12 7:5,22<br>8:22,23 9:15 10:16<br>12:2,3 21:4 26:4,18<br>27:3 28:23 32:2<br>33:10<br>working 27:20<br>wouldn't 21:13,20 44:6 | write 25:18 42:13,23<br>writing 16:2,4 23:10<br>25:3,7,13 34:3,5<br>written 25:6,16 27:17<br>42:17<br>wrong 15:20 17:23<br>wrote 27:2,15 28:14,17<br>34:5,7 40:10 43:3<br>44:8<br><br>**X**<br>x 1:4,11 32:5<br><br>**Y**<br>yeah 5:9 18:14 23:3<br>34:4 42:12<br>year 33:8,11 37:15<br>years 7:20 8:12 15:20<br>18:3,25 19:1,18 21:9<br>Yoder 2:8 5:10,14 6:11<br>6:18 11:8,9,15 18:15<br>19:9,21 20:6,22 21:1<br>21:18 22:4,13,20<br>23:1 24:13 25:11<br>28:11 29:6,10,14<br>30:9,22 31:1,15,20<br>35:7 36:13 40:9 41:4<br>42:4 43:25<br><br>**0**<br>06103 2:8<br>06107-1988 2:4<br><br>**1**<br>1 4:11 10:17,19<br>1:10 1:18<br>10 2:3 4:11 34:13<br>10-151 12:23 19:6<br>23:21 24:6,22 32:8,9<br>32:11,21,25 33:19<br>35:23 36:1,7,10,25<br>42:8<br>12 4:12<br>15 12:15 27:12 34:13<br>1979 8:21<br>1982 8:17<br>1984 8:6<br>1986 8:6,7<br>1994 7:14 21:10 22:12<br>25:3<br>1997 19:2 21:9,9 22:12<br>1999 15:20,23,25 26:8<br>26:10,19 27:12 32:17<br>43:2<br><br>**2**<br>2 4:12 12:13,15<br>20 34:14<br>200 33:11<br>2003 1:18 12:16 45:10<br>2005 45:14<br>214 2:3<br>27 4:13 | 3 4:13 27:9,13,14 28:4<br>28:14,17 30:14,16<br>31:12,13,25<br>3:00CV 1:7<br>30 1:14 10:23<br>31 45:14<br>36 4:14<br>363(AHN) 1:7<br><br>**4**<br>4 4:14 36:3,5<br>42 4:15<br>43 4:16<br><br>**5**<br>5 1:18 4:15 42:24 43:1<br>512 5:2<br><br>**6**<br>6 4:3,16 43:4,6,15<br><br>**8**<br>82 8:13<br>84 8:13<br>87 7:21<br><br>**9**<br>9 43:2<br>92 7:21<br>94 7:21 25:17<br>95 21:12<br>96 21:12<br>97 25:3,18 |

# ERRATA SHEET

CAPTION : ANNA M. CHIMOCHOWSKI VS. HARTFORD PUBLIC SCHOOLS
DEPOSITION OF:     ANNE BIRD
DATE OF DEPOSITION:  DECEMBER 5, 2003

In order to make this deposition more nearly conform to the testimony, the deponent wishes to make the following changes:

| PAGE | LINE | NOW READS | SHOULD READ |
|------|------|-----------|-------------|
| 9 | 14 | interest in unemployment | interest in employment |
| 18 | 7 | responsibilities of he as an | responsibilities as an empl[oyee] |
| 42 | 6 | she is an assistant | she, as an assistant |

_____
ANN F. BIRD

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the 18th day of December, 2003.

_____
HELEN APOSTOLIDIS
Commissioner Superior Court

~~My commission expires: May 31, 2005~~